No. 02-633

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 283

IN RE THE MARRIAGE OF

CHERYL L. MCDERMOTT-YEARGIN,
f/k/a/ CHERYL MCDERMOTT,

        Petitioner and Appellant,

   v.

BRUCE C. MCDERMOTT,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Eighth Judicial District,
                  In and for the County of Cascade, Cause No. ADR-98-059,
                  The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                K. Dale Schwanke, Jardine, Stephenson, Blewett & Weaver, P.C., Great
                Falls, Montana

        For Respondent:

                Joan E. Cook, Law Offices of Joan E. Cook, Great Falls, Montana

                           Submitted on Briefs: June 26, 2003

                                  Decided: October 9, 2003

Filed:

                    _____
                             Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 The District Court for the Eighth Judicial District in Cascade County granted Appellant, Cheryl McDermott's, petition for dissolution of her marriage to Respondent, Bruce McDermott. Later, Cheryl moved to modify the parenting provisions of the final decree. In her motion, Cheryl sought to be the primary custodian of the parties' children and in the alternative, she also sought a reduction in her child support payments to Bruce. The District Court denied both requests. Cheryl then filed a motion to amend the findings of fact, conclusions of law, and order, which the District Court also denied. Cheryl appeals both of the District Court's decisions. We affirm.

¶2 The issues on appeal are as follows:

¶3 1. Did the District Court err in not awarding Cheryl primary custody of the parties' children?

¶4 2. Did the District Court err by not reducing Cheryl's child support obligation?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 On February 12, 1998, Cheryl petitioned for dissolution of her marriage to Bruce. Prior to the hearing, the parties submitted an agreed parenting plan for their two children, Kyle and Riley. On January 6, 1999, the District Court entered a final decree, incorporating the parenting plan and dissolving the marriage.

¶6 On July 24, 2001, Cheryl moved to amend the parenting plan. The original custody schedule she and Bruce had been following provided that the parties alternate weeks with the children. This plan was no longer feasible because Cheryl had moved to Boise, Idaho,

from Great Falls, Montana. When Cheryl moved, she and Bruce worked out an arrangement whereby the children would spend the school year with Bruce in Great Falls, and the summers in Boise, with Cheryl.

¶7 At the time of the motion, Cheryl had become dissatisfied with the new custody arrangement. The motion sought to reverse the provisions of the arrangement so that Cheryl would have school-year custody of the children, while Bruce would have his visitation in the summers. The motion alleged that Bruce had a temper, was a negative influence on the children, and that Cheryl did not like his use of corporal punishment. She argued that her home would provide a nurturing environment and that there were more "opportunities" for the children in Boise than there are in Great Falls.

¶8 On June 6, 2002, the District Court denied Cheryl's motion. She then filed a motion to amend the findings of fact, conclusions of law, and order, which the District Court also denied. On September 23, 2002, Cheryl appealed both of the District Court's decisions.

## STANDARD OF REVIEW

¶9 With respect to cases establishing or modifying child custody, our standard of review is whether the district court's findings of fact are clearly erroneous. *Czapranski v. Czapranski*, 2003 MT 14, ¶ 10, 314 Mont. 55, ¶ 10, 63 P.3d 499, ¶ 10. If no clear error is apparent, the district court's decision will be upheld unless the Court abused its discretion. *Czapranski,* ¶ 10. With respect to cases establishing or modifying obligations for child support, we review a district court's ruling for abuse of discretion. In re Marriage of Syverson (1997), 281 Mont. 1, 9, 931 P.2d 691, 696.

3

## DISCUSSION

¶10    Did the District Court err in not awarding Cheryl primary custody of the parties' children?

¶11    A significant portion of Cheryl's first argument on appeal concerns the District Court's verbatim use of Bruce's proposed findings of fact and conclusions of law. It is Cheryl's contention that the court did not properly consider the evidence before it, and did not take care to exercise independent judgment. Specifically, Cheryl complains about the court's conclusions 1) that she knowingly failed to financially support her children when she was able to do so; and 2) that there was a *de facto* parenting agreement. Additionally, Cheryl believes that because the District Court did not make any specific finding that Bruce said demeaning things about her, then the court could not possibly have independently considered the evidence.

¶12    We do not agree with Cheryl's assessment. We have previously held that a district court may adopt one party's version of the findings and conclusions if that version is "sufficiently comprehensive and pertinent to the issues to provide a basis for a decision and [is] supported by the evidence." *In re Marriage of Jacobson* (1987), 228 Mont. 458, 465, 743 P.2d 1025, 1029. We will only find error if it appears that the district court did not exercise independent judgment. *Jacobson*, 228 Mont. at 465, 743 P.2d at 1029. The District Court heard testimony by witnesses for both sides, reviewed physical evidence, and heard arguments by both attorneys. In fact, the record reflects that Cheryl's attorney specifically questioned the court about its verbatim use of Bruce's proposed findings and conclusions.

4

The court responded that it was aware of the Montana Supreme Court's requirement concerning verbatim use of one party's proposed findings. He then told counsel that he was "satisfied" that the ruling was supported by the evidence. In this case, the District Court committed no error through utilization of Bruce's proposed findings and conclusions, which were thorough and pertinent to the issues at hand.

¶13 Broadly stated, the remainder of Cheryl's first argument is that she sometimes does not like the way Bruce acts or the things he says about her, and that she believes Boise is a nicer place to live than Great Falls. She complains loudly that Bruce has said bad things about her in front of the children, and is upset the District Court's findings did not even mention those instances. She recites a laundry list of incidents allegedly perpetrated by Bruce, and quotes several of Bruce's witnesses, largely out of context, in an attempt to bolster her own evidence against him. In essence, Cheryl asserts that the District Court erred in its findings simply because the court did not include any language disparaging to Bruce in its order.

¶14 Contrary to Cheryl's assertions, the record shows that the District Court's order is supported by substantial evidence, and that the court reasonably concluded that no change in custody arrangements was necessary. At the hearing, both sides conceded that they do not always get along. Yet, they acknowledged that they both attempt to cooperate when visitation matters are the issue. In its findings the court noted, "that although they attempt to get along for the sake of their children, often their communication results in disagreements and resentment remaining from the time of their marriage. . . . However, based on the

5

testimony of the witnesses, it appears that [Bruce], as well as [Cheryl] encourage the relationship between their children and the absent parent." At the hearing on the motion to amend, the court evidenced its awareness of the gravity of the issues when it reminded both parents of the negative effects disparaging one another might have on the children, stating, "I would caution both parents to speak only positively of the other parent. Foster a good relationship . . . to not do anything to harm the children."

¶15 The record contains numerous admissions by Cheryl, her new husband, Bryan Yeargin, and her attorney, that the children are thriving under the arrangement currently in place. When questioned about the boys' progress in school, Cheryl admitted they were doing fine. When questioned about Bruce's cooperation with Cheryl on her visits to Great Falls, Bryan admitted that Bruce always allows the boys to stay with Cheryl for the duration of the visits, and that Bruce has never denied Cheryl access to the boys. Additionally, Bryan stated that before the custody battle began, Bruce had actually stayed with him and Cheryl on occasion and that things usually went very well. He admitted that Bruce has taken Kyle and Riley and Bryan's two sons skiing and that Bryan trusts Bruce with all the children. He acknowledged that he has no complaints about Bruce's participation in, and oversight of, Kyle's and Riley's education. Finally, Bryan even stated that Bruce has gone so far as to reinforce Bryan's role as stepfather to Kyle and Riley.

¶16 Montana law requires that the court determine custody and visitation based on the best interests of the children involved. Section 40-4-212, MCA. To facilitate this determination, the statute requires the court consider all parenting factors relevant to the case before it, and

the statute lists a number of parenting factors the court should consider. Section 40-4-212, MCA. The district court is not, however, required to make specific findings as to each and every factor delineated in the code. *Czapranski*, ¶11. The District Court's conclusions clearly state that it considered the factors listed in § 40-4-212, MCA. The court went so far as to specify three factors that it found relevant; i.e. continuity of care, developmental needs of the children, and Cheryl's failure to financially support the children when she was able to do so. Each of these factors supports the District Court's decision that the child custody arrangements should remain as they are. The record supports the District Court's decision and we find no error.

¶17 Did the District Court err by not reducing Cheryl's child support obligation?

¶18 Cheryl argues that the District Court erred in its imposition of what she feels is an unconscionable child support award. When Cheryl and Bruce were divorced in January 1999, they were splitting time with the children equally, and their incomes were so similar that neither was ordered to pay child support. Just a few months after the divorce, Cheryl lost her job. She looked for work in Great Falls, but was unsuccessful in her search there. At that point, she received a tip from a friend in the finance world that there might be jobs available in Boise. Working off that tip, she focused her attention on the Boise area, found a job, and relocated in July 1999. The new job brought with it an income increase. In August 1999, the Montana Child Support Enforcement Division ordered her to begin paying $544.00 per month in child support.

7

¶19    In December 1999, Cheryl moved in with her then-boyfriend, now-husband, Bryan, who earns from $125,000 to $150,000 a year.  Because of this new arrangement, Cheryl's personal standard of living took a turn for the better.  The house she shares with Bryan is worth at least $440,000; she drives a BMW; she and Bryan are able to take long vacations; the wedding ring she wears is two full carats.  Bryan testified that his income is sufficient to support their family, whether or not Cheryl has any income to contribute.  Cheryl, to her credit, continued to work as a trust officer.  However, in September 2000, Cheryl lost her job because the company closed its Boise office.  She testified that when she lost her job she looked for other positions as a trust officer, but because she lacked a college degree she was unsuccessful.

¶20    In the meantime, Cheryl had been developing a friendship with Cara Beers, an interior designer in Boise.  Cara was encouraging Cheryl to jump into that business.  Cheryl testified that interior design was something she had always wanted to try, but she had never had the opportunity.  She testified that there are significant start-up expenses inherent in interior design and that it is necessary to invest money in the business in order to make money. Prior to her relationship with Bryan, she had never been in a position, financially, to attempt it. However, with Bryan infusing the necessary capital, and with Cara to advise her, she believed she had a realistic chance at starting a successful business.  Cheryl did begin work as a self-employed interior designer.  Her first profit and loss statement did not show a profit, but did show over $92,000 in revenues.  Cheryl was expecting her business to become profitable in the 2001-2002 fiscal year.

¶21     In order to have a child support obligation modified, the party seeking the modification must establish changed circumstances so substantial and continuing that to keep the existing obligation intact would be unconscionable. Section 40-4-208(2)(b)(i), MCA. Changes in circumstances can result from voluntary or involuntary actions on the parent's part. We have held that the best approach for dealing with changed circumstances is to allow the district judge to consider the type of change that has occurred, the reasons for the change, and the circumstances as a whole. *In re Marriage of Clyatt* (1994), 267 Mont. 119, 122, 882 P.2d 503, 505. Additionally, we have held that "a district court must be realistic and take the actual situation of the parties into account when calculating child support obligations." *Albrecht v. Albrecht,* 2002 MT 227, ¶ 12, 311 Mont. 412, ¶ 12, 56 P.3d 339, ¶ 12.

¶22     Cheryl is correct when she argues that she is not voluntarily unemployed or underemployed as those terms are commonly understood. In other words, she did not quit her job and then seek to avoid her child support obligations. Thus, the District Court's finding of fact that she was voluntarily unemployed is incorrect. Also the District Court's imputation of Cheryl's former trust employment wages to her on the basis of Rule 37.62.106(7)(a)-(b), ARM, is incorrect. Conversely, Cheryl is incorrect in her assertion that no income should be imputed to her on the basis that she has made diligent efforts to "return to customary self-employment, to no avail," as required by Rule 37.62.106(9)(d), ARM.

¶23     Determination of income for a self-employed parent is based on Rule 37.62.108(3), ARM. The rule provides that income should be annualized when possible to avoid skewed results based on temporary conditions. Rule 37.62.108(3) ARM. Additionally, we have

held that the time-frame over which annualized incomes should be averaged should be lengthy enough to ensure an accurate portrayal of the parent's earning ability. *Albrecht*, ¶ 12. The instructions for completing child support worksheets state that an average of at least three years of the net income from the parent's income tax returns is usually necessary to get an accurate picture, and our cases suggest that two years is probably the minimum. *Albrecht*, ¶ 12.

¶24 Cheryl is self-employed as an interior designer. However, upon termination from the trust position, Cheryl did not "return to customary self-employment," as the statute requires. Rule 37.62.106(9)(d), ARM. Rather, she made a conscious choice to pursue a line of work in which she was interested, but in which she had no experience. The District Court found that Cheryl, at all times, was capable of finding work in the financial world, even if the market conditions at the time made the search for new employment difficult. Instead of continuing her pursuit of trust-related work, Cheryl chose to pursue a new career. Cheryl's business did not turn a profit in its first year of operation. Yet that does not mean she has attempted self-employment "to no avail." Rule 37.62.106(9)(d), ARM. Cheryl testified that she believed her business would be profitable in its second year. Two of our cases illustrate scenarios factually similar to Cheryl's. In *In re the Custody and Support of H.Q.* (1985), 218 Mont. 308, 709 P.2d 154, the support-paying father lost his job and decided to establish his own business. He testified it would take him three to six months to make the business profitable. We held the temporary low-income circumstance in which he found himself was "not so continuing as to make the original agreement unconscionable." *Support*

10

*of H.Q.*, 218 Mont. at 311, 709 P.2d at 156. In *Hughes v. Hughes* (1983), 205 Mont. 69, 666 P.2d 739, nearly the same situation arose. The support-paying father lost his job and decided to reestablish a consulting business he previously ran. He also believed it would take about six months to become profitable. We held that the temporary reduction in income was not so severe as to warrant a reduction in support payments. *Hughes*, 205 Mont. 69, 666 P.2d 739.

¶25    The District Court found Cheryl to be voluntarily unemployed. She is not unemployed. She is self-employed in a business that did not show a profit its first year. Because Cheryl's business has only been in existence for one unprofitable year, it is not possible either to annualize or average her self-employment income. However, the temporarily unprofitable state of her business is not of such a continuing nature that a reduction in child support payments is warranted. Therefore, the District Court's use of her previous, trust-related, salary to impute an income to her was proper.

¶26    It is the policy of this state to ensure that children are supported by their parents and it is the court's duty to enforce those policies. We agree with the District Court that personal lifestyle and career choices might not serve as satisfactory reasons to reduce support obligations. We also recognize that the law does not require a supporting parent's new spouse to contribute to the supporting parent's child support obligations. Section 40-6-217, MCA. However, when the supporting parent remarries and, consequently, is in a position where he or she does not have to contribute to their new family's finances, that supporting

11

parent will still be required to do whatever is necessary to ensure the child support payments are made.

¶27    Cheryl asks this Court to view her change in circumstances too narrowly. She asks us only to consider that she lost two trust-related jobs in quick succession. She asks us to reverse the decision of the trial court and disregard her personal choice to step into the entrepreneurial world, accompanied by her husband's ability to finance that endeavor. Under these circumstances, we decline to disturb the District Court's finding that there has been no substantial and continuing change in circumstances sufficient to modify Cheryl's child support obligation.

¶28    Affirmed.

/S/ JOHN WARNER

We Concur:

/S/ JIM RICE
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ PATRICIA COTTER